Good morning, Your Honors. May it please the Court, Cynthia Hahn for appellate Christopher Hallmark, and I'd like to reserve two minutes for rebuttal time. Okay. I think the whole thing – can you hear me okay? Is this – okay. Just keep your voice up. Okay. The whole matter really was synopsized by the judge at the Rule 29 motion when he said that this case turned on the question of intent and the case turned on whether there was mere preparation or a substantial step taken towards the attempted arson that Hallmark – Mr. Hallmark was charged with. Now, no objections were made to the jury instructions by the defense counsel, so we're looking at plain error here. Yes, sir? Okay. Did he submit – did defense counsel submit any of his own instructions? He did submit his own instructions, but – Did he have an intoxication instruction? He submitted no intoxication instruction. He submitted no abandonment instruction. You think he might have thought about that? I cannot speculate as to what he thought about. I do know Perez, an en banc 1997 case in this Court, says there has to be something on the record showing that defense counsel knew and abandoned. Let me ask you this. There was evidence of intoxication. Everybody acknowledge that? Extreme evidence of intoxication. Did the judge have any obligation, any sort of sua sponte obligation to say, oh, my goodness, this is a – might want to instruct on intoxication? To the extent that he may have thought about constitutional error at this point, because when there's that much evidence, when the co-defendant at his sentencing says he was retarded drunk, and all during the trial, everybody was saying – That was at sentencing, correct? Well, that's what I was just going to say, is all during the trial, people couldn't even agree on what was said before they went, what was said after it happened. Nobody really knew because they couldn't remember, so they just gave it a best guess effort as drunk as they were. Are you suggesting that – assuming defense counsel really didn't want an intoxication instruction and that's why he didn't ask for it, the Court had to cram it down his throat? No, Your Honor, but when there is a chance of constitutional error, that is what is appearing here on the record. Well, that's sort of putting carts before horses. It's a chance of constitutional error, it is said, because he was probably intoxicated. But everybody knew he was intoxicated. Counsel just didn't want to take that position. He had a whole different defense going, right? His defense was that this guy was thinking clearly enough that he'd walked right up to the edge, didn't even complete an attempt, didn't even get to an attempt, walked up to the edge and changed his mind. I don't. How do you square not having enough mind to do anything, basically, with changing your mind, making a reasoned decision, I'm not going to do this? Well, what defense counsel actually said was he went up there, he had been drinking all night, the bottle of rum was almost empty, and he gets there, Rudeen, his co-defendant, threw the rock, the window smashed, and it sobered him up. It went, wait a minute, what am I doing here? And that's when he had that moment of clarity and dropped the bottle. So defense counsel --- But, counsel, wasn't that bottle already have gasoline or whatever that substance was? And wasn't there a rag in there that they had put on fire? Wasn't that done? And then they threw the bottle, and it didn't go to the window, but it landed in the grass. Now, somebody must have done all that to cause this to happen. It didn't happen by itself. Well, Your Honor, there was no testimony whatsoever that he threw the bottle. Nobody saw him throw the bottle, the ATF and the Reno police. Didn't they have a fuse in the bottle? They had a piece of a bar rag. And they lit that rag. We don't know who lit the rag. Okay, but they threw that bottle when the fuse was lit, and they threw it at the window or in that direction. It didn't hit the window. It landed in the grass. They may have missed or may have dropped it, but it was already lit. Your Honor, I just have to refer you to excerpts of record 114, 154, where the Reno police and the ATF said, and they agreed, there's no evidence the bottle was thrown. It could just as easily have been dropped on the rocks as thrown. But weren't they about 15, 20 feet away from the window when that bottle landed in the grass? Somebody must have thrown it. I do not think that they were that far away, according to the record. I don't know what they agreed to, but I thought the government actually, the prosecution argued to the jury, argued somewhere anyway, well, there's no direct evidence of throwing, but also the bottle was not just dropped at the sidewalk, it was on the other side of the bushes. And how did he manage to drop it on the other side of the bushes? I seem to recall that argument. It seems strange that the government agreed that it wasn't thrown and yet it was dropped and argued, yeah, but it doesn't look like it was dropped, it looks like it was in a funny place. Wasn't it that argument? I'm sorry? Wasn't that argument made? I thought it was. Well, actually, the first person out there from TGIFs to see the bottle said he wasn't even worried about it. It was about four feet out from the building in the rocks, and so he wasn't worried about it. And I do have, here is the EOR site is 240 to his testimony. And he was the first person to see the bottle. Now, there's a difference between throwing a bottle and trying to, you know, make a fire. And a difference between the rock making you go, oh, my God, what have we done, and tossing the bottle and running. Because he was right behind his co-defendant at the time, and the co-defendant testified to that. And as a matter of fact, the co-defendant testified that he threw the rock twice, which accounts for the two bangs the people inside TGIFs heard. So there really was no evidence from anybody that our client threw the bottle. He may have tossed it down and ran, which he certainly did. Let's talk about abandonment. Sure. It looks a lot like we're talking plain air, okay? Yes. It looks a lot like if anything, there is no clarity in this area. It's hard to make it plain. And I'm only saying it from this standpoint. It appears that an awful lot of jurists say anyway, you really can't abandon an attempt once you've taken the final step. Once you've taken the step that makes it an attempt, you can't abandon it. If you haven't taken that step yet, then it's not an attempt. It looks like that's what position counsel was taking. And not enough steps have been made to make it an attempt, and therefore it's not an abandonment. It's just it wasn't an attempt. Well, this is my problem with this. And I think you're exactly correct on that, Your Honor, is that substantial stab is such a legal concept. It is a term of art, basically. And you're asking the jury with no instruction except mere preparation is not a substantial stab. That tells you what one isn't. It doesn't tell you what one is. So I think the jury needed a duty. Should I keep going and just answer the question? I see you all right. Thank you. Okay. So I think the judge had a duty to clarify substantial stab and then tell them that abandonment, and this should have been an instruction given, if you find that the defendant abandons his attempt of his own will and not because intervening circumstances caused him to fail to complete the attempt, you must find the defendant not guilty. I think that would have been a great instruction to put in, and it could have been made from case law. Okay. And I'll finish later. Thank you. You have a short time for rebuttal. Good morning, gentlemen. May it please the court, counsel. I'm Paul Puglisi. I'm the assistant U.S. attorney from Reno, Nevada, presenting the government's argument in this case, and I was the attorney that tried the case. That's the first time we've heard what the proposed abandonment instruction should be. And the problem with it is it's not an instruction that's legal because it doesn't reference what an attempt is, the attempt being a substantial step towards completion beyond mere preparation. And that was hit on in argument, which, granted, is not evidence, hit on during the case. The judge instructed him on that. So what more needed to be the judge need to instruct the jury on? He had, in this case, Hallmark had already gone beyond the zone of mere preparation. The defense didn't propose an abandonment instruction, and the reason is because they would have put on paper, well, the throwing of the rock and the breaking of the window in order to allow the bottle to go through, that's still mere preparation. We actually needed the bottle to go through. And, gentlemen, the government just doesn't agree with that. They've already gone beyond mere preparation, and by throwing that rock and then the defendant lighting the fuse, that in and of itself is beyond mere preparation. If they had not gone beyond mere preparation, if it was still preparation, I understand that that wouldn't be abandonment. It just wouldn't be an attempt at all. Exactly, Your Honor. We would not, the government would not have established the elements beyond a reasonable doubt. In addition, counsel has indicated that the bottle was about four feet from the building. The evidence of trial was from the position where they were standing on the sidewalk, there was landscaping, rocks, and some bushes. It was 11 feet 3 inches. The bottle was found approximately three feet from the building and behind two bushes. So it then became the case of the bouncing bottle. A bottle was able, because this defendant, although too drunk to form a specific intent, was still able at that critical moment to get this moment of clarity and realize, ah, I've gone too far. And he dropped the bottle. Well, that just is not what the evidence supported. The only support for that came from counsel's, defense counsel's opening and dropped. No witnesses saw Hallmark, the defendant, throw the bottle. Witnesses did testify that immediately after, when they ran away from the scene, the defendant yelled, go, go, go, and admitted at that point and then days later that he had thrown the bottle. The only, again, the only evidence, really the only mention at trial that the bottle was dropped came from counsel, and that's not evidence. And that leads to the voluntary intoxication instruction. Counsel's brief provides, when the government agrees, substantial evidence that this defendant may have been intoxicated. The problem is that evidence didn't come out at trial. The term by the co-actor, Robert Rudine, I was retarded drunk. I was intoxicated. That came out during this change of plea. During the trial, what Rudine said was, we had been drinking. Never said how much they had drank. And, gentlemen, the testimony at trial was two rounds were ordered at the bar. That came from the bartender. Then some drinks were ordered at this Pizza Baron place. During the stay at the Pizza Baron, the defendant and Rudine went to a Ben's Liquors and purchased a 750-milliliter bottle of Bacardi 151 rum. Nowhere in the trial transcript does anyone say how much the defendant drank. Now, the government agrees. Hey, if you're drinking Bacardi 151 and you have more than the sip, it may affect you. But, you know, there's no testimony at all at the trial to say that Hallmark was affected. No one said anything about Hallmark's demeanor. Slurring his speech, unable to stand. The closest we get is Rudine describing himself and saying, yeah, when we were helping Hallmark's boss move the couch, you know, we knew what we were doing. We were able to stand up. We were able to accomplish this task of moving this heavy couch without a problem. And then the evidence itself established that the defendant had the mental wherewithal to form this specific intent. The purchase of the bottle. The use of the bar rag as a fuse. Talking to Rudine and saying, you know, at one point it was, hey, let's go back there. Let's beat up these folks. They shouldn't have done that. Now let's torch the place. And then going there and then it's just the timing of it. He doesn't just throw the bottle or drop the bottle. No. Rudine throws the rock and breaks the window. Rudine, we know the wick was lit. Who lit it? The trial testimony was that Hallmark was holding it. There was a discrepancy on that at one point. But Hallmark's holding the bottle. Rudine lights it and Rudine runs away first. And the next thing we hear is Hallmark telling his cronies, go, go, go. I torched the place. I threw the bottle. Suppose one could trick out of the evidence that there was enough to indicate that he might have been intoxicated. There was enough for a juror to decide, a rational juror to decide he was intoxicated. Suppose that turns out to be the case. What do you have to say about it then? At that point, Your Honor, the government believes that the defense attorney, based on the record, made a conscious decision, he had to have, that the voluntary intoxication instruction ran counter to this abandonment theory where the defendant got the moment of clarity after Rudine broke the window. Those two just don't go together. It's important to note the sentencing hearing, while it wasn't evidence at trial, it does establish that the neuropsychologist that the defense called had examined Hallmark and said in his opinion Hallmark was intoxicated. That was available. That was done before trial. He also indicated that Hallmark said he's the one that had the bottle at the TGI Fridays. So it's the government's contention that the defense counsel knew of the Ninth Circuit jury instruction 6.8 on voluntary intoxication. It's not a novel theory, but decided no, this is not the horse I want to ride in this case. Our better effort is to say that the defendant abandoned the attempt or did not engage in sufficient conduct to establish that he took a substantial step towards completion of the crime and went beyond mere preparation. And, gentlemen, if there are no other questions, that's all the government has. No, thank you. Thank you. Thank you. A couple of things I'd like to talk about. First was that the neuropsychologist Schmidt was brought in not to assess how drunk Hallmark was that night, but to find any evidence of permanent conductive impairment from drug use. That's what he was called in to determine. He was not trying to determine how drunk Hallmark was. The other thing was there is a site, there are actually two sites in the record where people testified that Hallmark and Rudine drank the majority of the 151 rum bottle, and that's at EOR 261 and 403. So there was ample evidence that they were the ones drinking the rum bottle. As for the fact that these defenses would have been conflicting, I don't think there was any evidence that Hallmark and Rudine would tend to disagree with that, because voluntary intoxication goes to the attempt element. Abandonment goes to the substantial step element. So there's no conflict there, so I don't see how the defense counsel would have thought those were conflicting defenses to raise. And I see my time is up. Yes, thank you. The matter will be deemed submitted. Thank you, counsel, for your argument. Next case on the calendar is Hiracheta v. McGrath.
judges: Fernandez, Paez, Weiner